IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

DMB REALCO, LLC, et al.,
*Plaintiffs/Appellants/Cross-Appellees*,

*v.*

MARISCAL, WEEKS, MCINTYRE, & FRIEDLANDER, P.A., et al.,
*Defendants/Appellees/Cross-Appellants.*

No. 1 CA-CV 24-0278

FILED 07-08-2026

Appeal from the Superior Court in Maricopa County
No. CV2018-010034
The Honorable Erik Thorson, Judge

**VACATED AND REMANDED**

COUNSEL

Perkins Coie LLP, Phoenix
By Michael R. Huston, Diane M. Johnsen, Jordan M. Buckwald
*Counsel for Defendant/Appellee/Cross-Appellant*

Cohen Dowd Quigley PC, Phoenix
By Daniel G. Dowd, Daniel E. Durchslag, Jenna L. Brownlee
*Counsel for Plaintiff/Appellant/Cross-Appellee*

---

## OPINION

Presiding Judge Michael S. Catlett delivered the opinion of the Court, in which Judge Daniel J. Kiley and Judge James B. Morse Jr. joined.

---

**C A T L E T T**, Judge:

¶1	Legal malpractice claims must commence "within two years after" they "accrue."  A.R.S. § 12-542.  But our legislature has not defined when such claims accrue.  *Glaze v. Larsen*, 207 Ariz. 26, 29 ¶ 9 (2004).  Instead, that has been "left to judicial decision."  *Id.*  In a non-litigation context, legal malpractice claims accrue when the client should know its attorney's negligence caused the client harm.  *Com. Union Ins. v. Lewis and Roca*, 183 Ariz. 250, 252–53 (App. 1995).  And harm is sufficient when "irremediable or irrevocable[.]"  *Keonjian v. Olcott*, 216 Ariz. 563, 566 ¶ 13 (App. 2007).  We decide whether the plaintiffs timely asserted their legal malpractice claim based on negligent tax advice.

## FACTS AND PROCEDURAL HISTORY

¶2	In July 2006, DMB Realco, LLC ("DMB") retained an attorney at Mariscal, Weeks, McIntyre, & Friedlander, P.A. (collectively, "Mariscal") to donate a conservation easement to the Town of Buckeye ("Buckeye").  Mariscal prepared a conservation easement deed ("Original Deed"), intending for it to qualify DMB for a charitable contribution under Section 170 of the Internal Revenue Code ("Code").  DMB recorded the Original Deed in December 2006.  So on its 2006 tax returns, DMB claimed a $26.44 million deduction ("Deduction").

¶3	Fast forward four years.  The Internal Revenue Service audited DMB's 2006 tax return.  The IRS objected to the Deduction because it thought the Original Deed violated Treasury Regulations and the Code.  DMB retained tax counsel.

¶4	In May 2011, an IRS Agent ("the Agent") sent DMB a Form 4605-A Examination Changes Report ("Preliminary Report"), outlining why the Deduction failed.  The Preliminary Report included a Draft Non Cash - Land Conservation Easement Lead Sheet ("the Draft Lead Sheet"), explaining DMB "failed to obtain a qualified appraisal, failed to obtain a

contemporaneous written acknowledgement, and did not fully complete the [appraisal summary]." The Draft Lead Sheet concluded "[t]he easement [was] not granted in perpetuity, and the vested rights of the donee organization do not meet the requirements of the regulations." After DMB's tax counsel responded, the Agent revised the Draft Lead Sheet, sending a final version ("2011 Lead Sheet") in July 2011.

¶5           In January 2012, the IRS sent DMB a 60-Day Letter ("First 60-Day Letter"), explaining it was "proposing adjustments to partnership items for the" 2006 tax year. That Letter gave DMB three options: (1) agree to the adjustments by paying additional taxes, interest, and penalties; (2) request an appeals conference; or (3) do nothing.

¶6           DMB chose option two—it appealed. In April 2012, DMB "dispute[d] all of the[] proposed adjustments." DMB admitted Mariscal erred in "paragraph 6 of the [Original] Deed," but it maintained the Original Deed complied with Treasury Regulations and reforming the Deed would fix non-compliance. Soon after, DMB recorded an amended and restated deed ("Amended Deed").

¶7           In September 2012, DMB supplemented its protest, notifying the IRS that the Amended Deed "clarif[ied] the parties' original intent[.]" That supplement also discussed more caselaw and provided a new appraisal, while still challenging the proposed adjustments. So the IRS returned the case to the Agent.

¶8           In May 2014, the Agent sent DMB a Form 4605-A Examination Changes Report, addressing DMB's protest. The Agent conceded "[t]he issues regarding qualified appraisal and appraisal summary" but still challenged the "contemporaneous written acknowledgement, qualified real property interest granted in perpetuity, and valuation" issues. After revisions, the Agent issued a final report ("2014 Report"), again canceling the Deduction.

¶9           In October 2014, the IRS issued a new 60-Day Letter ("Second 60-Day Letter"), explaining it was "proposing adjustments to partnership items for the partnership and [2006 tax year]." That Second 60-Day Letter again gave DMB three options; DMB again appealed. In that appeal, DMB "dispute[d] all of the[] proposed adjustments." DMB's tax counsel then spent a year negotiating with IRS staff.

¶10          In December 2015, the IRS Office of Appeals issued a Final Partnership Administrative Adjustment ("FPAA"), adjusting "certain

partnership items" for 2006. The FPAA explained the Deduction violated Section 170, so the IRS canceled it.

¶11 In 2016, DMB sued in state court to reform the Original Deed and in federal court to challenge the FPAA. In state court, DMB got a judgment reforming the Original Deed retroactive to "the original recording date," thereby mirroring the Amended Deed's terms. In federal court, DMB settled with the United States. The United States agreed DMB could deduct $6,610,000 for 2006, if it paid penalties and interest.

¶12 In July 2016, DMB and Mariscal paused the statute of limitations using a tolling agreement. After extensions, that agreement expired in June 2018.

¶13 In August 2018, DMB sued Mariscal. Mariscal moved for summary judgment, relying on the statute of limitations. *See* A.R.S 12-542. Mariscal argued DMB's malpractice claim accrued in July 2011, when DMB received the 2011 Lead Sheet. Mariscal argued DMB's harm then became "irremedia[ble]" and "irrevocable" because the Agent claimed errors in the Original Deed could not be fixed. DMB responded that accrual occurred no earlier than December 2015, when the IRS issued an FPAA.

¶14 The superior court granted summary judgment. It concluded Mariscal harmed DMB when DMB executed the Original Deed. The court also concluded DMB discovered its harm no later than April 2012, when it filed its protest. So by waiting four years to pause the limitations period—two years after accrual—DMB's claim came too late.

¶15 Three months after final judgment, Mariscal sought sanctions because DMB had rejected an offer of judgment. The court said no.

¶16 DMB appealed summary judgment and Mariscal cross-appealed sanctions. We have jurisdiction. *See* A.R.S. § 12-2101(A)(1).

## DISCUSSION

¶17 DMB challenges summary judgment. We review summary judgment de novo, viewing the facts most favorably to DMB (the non-moving party). *See Andrews v. Blake*, 205 Ariz. 236, 240 ¶ 12 (2003). Summary judgment lies when "there is no genuine dispute as to any material fact and [Mariscal] is entitled to judgment as a matter of law." Ariz. R. Civ. P. 56(a); *Orme Sch. v. Reeves*, 166 Ariz. 301, 309 (1990). A "court may determine" accrual "as a matter of law." *Satamian v. Great Divide Ins.*, 257 Ariz. 163, 170 ¶ 14 (2024).

¶18         DMB requests we vacate summary judgment, arguing the superior court determined incorrectly when it was harmed and discovered that harm.  DMB contends it could not have known Mariscal caused it harm until the IRS issued an FPAA.  Mariscal responds that DMB suffered harm when executing the Original Deed, and it knew Mariscal caused that harm no later than 2012, when DMB admitted the Deed contained errors. Mariscal cross-appeals, again seeking sanctions.

**I.**

¶19         Under § 12-542, legal malpractice claims must commence "within two years after" accrual.  *Keonjian*, 216 Ariz. at 565 ¶ 9.  The discovery rule controls accrual.  *Com. Union*, 183 Ariz. at 254.  It says a legal malpractice claim "cannot accrue until the client knows or should know of his attorney's negligent conduct."  *Id.*  That rule is easier said than applied.

¶20         For accrual, an attorney must commit negligence (easy enough).  *Glaze*, 207 Ariz. at 29 ¶ 15.  But doing so does not alone trigger accrual.  Instead, a client must "sustain 'actual and appreciable' harm [because] of [the attorney's] negligence."  *Com. Union*, 183 Ariz. at 254 (quoting *Ariz. Mgmt. Corp. v. Kallof*, 142 Ariz. 64, 68 (App. 1984)).  So attorney negligence resulting in no harm delays accrual.  *Id.*  There, the limitations period starts when the client should know that his attorney's negligence has caused actual harm (this is where things get harder). *Keonjian*, 216 Ariz. at 565 ¶ 9.

¶21         True, a client need not know how much he was damaged. *Com. Union*, 183 Ariz. at 255.  As we have noted, "the occurrence of harm and the extent of damages" are "distinct."  *Id.*  So accrual is not delayed until the client "learns the full extent of his damages."  *Id.*  Rather, the discovery rule requires only "actual and appreciable" harm; accrual occurs before a client calculates its exact damages.

¶22         To make things fuzzier, these concepts apply differently in different contexts.  There are at least three such contexts—litigation malpractice, transactional malpractice causing immediate and irrevocable harm, and transactional malpractice where harm is delayed.

**A.**

¶23         Like all humans, litigators make mistakes.  And sometimes those mistakes rise to malpractice.  When they do, a malpractice claim accrues when the litigation (including any appeal) ends.  *See Amfac Dist. Corp. v. Miller*, 138 Ariz. 152, 154 (1983).

¶24 In that context, "[n]egligence alone is not actionable; actual injury or damages must be sustained before a cause of action in negligence is generated." *Id.* at 153. But for litigation malpractice, harm is not ascertainable until final judgment. "While the underlying civil case is . . . on appeal, the possibility always exists that the malpractice plaintiff will eventually prevail[.]" *Glaze*, 207 Ariz. at 29 ¶ 15. Put differently, when "a plaintiff has discovered actual negligence, if he has sustained no damages, he has no cause of action." *Amfac Dist. Corp.*, 138 Ariz. at 154. So "the injury or damaging effect on the unsuccessful party is not ascertainable until" an appeal ends or the period to appeal expires. *Id.*

**B.**

¶25 Transactional lawyers are also fallible. They too commit malpractice. When they do, "the damage or injury [usually] occurs" when malpractice does. *Com. Union*, 183 Ariz. at 256.

**1.**

¶26 Two opinions show this reality. First, *Keonjian*. There, the plaintiff suffered immediate, irremediable, and irrevocable harm by signing a negligently drafted property deed and gift letter. *Keonjian*, 216 Ariz. at 566 ¶ 13. The deed stripped her of property rights, and the letter deprived her of reimbursement rights. *Id.* Also, her harm was "irremediable or irrevocable . . . because 'a future appeal or other court proceedings' would not have enabled her to [remedy the harm]." *Id.* (quoting *Glaze*, 207 Ariz. at 30 ¶ 15 n.1). And she admitted more than two years prior that her lawyer deserved the blame. *Id.* ¶ 15 ("My lawyer is supposed to tell me: Stop, it's not what you want to be done. But I thought he knew better. He's a lawyer."). So there, the malpractice immediately caused her "irremediable or irrevocable" harm, triggering accrual. *Id.* ¶ 13.

**2.**

¶27 Second, *Kallof*. There, attorney Kallof drafted a settlement agreement with the Maloufs, which his client signed on June 6, 1968. *Kallof*, 142 Ariz. at 65. Kallof told his client that "upon execution, the settlement agreement would be an enforceable contract[.]" *Id.* But the Maloufs had other plans. *Id.* at 66. So in 1971, the client sued them. *Id.* The superior court granted summary judgment for the Maloufs, this court affirmed, and our supreme court denied review. *Id.* The client sued Kallof in 1981; the superior court dismissed that lawsuit as untimely. *Id.*

**¶28**        We affirmed.  The client argued its claims were timely because it suffered no harm until it exhausted its appeal.  *Id.* at 67.  We disagreed.  We concluded the claim was untimely because the client claimed damages in the 1971 litigation "of $5,000 per month for each month *from and after June 6, 1968.*"  *Id.* (emphasis added).  Similarly, it "claimed other damages in the amount of $125,000 *from and after June 6, 1968.*"  *Id.* (emphasis added).  Though "Kallof's total liability . . . was not certain and determined," the client admitted it "began sustaining damages on the date the settlement agreement was executed[.]" *Id.* at 67–68.  Because the client brought its claim in 1981, thirteen years after it claimed it first suffered harm, its claim was tardy.  *Id.*

### C.

**¶29**        Unlike these settings, others exist when a client cannot know immediately if its transactional attorney committed malpractice or whether its attorney caused the "wrong and the resulting injury." *Satamian,* 257 Ariz. at 171 ¶ 16.  Those are often situations when deciding whether transactional advice met a client's goals turns on later legal proceedings.

### 1.

**¶30**        The seminal opinion here is *Commercial Union*.  There, an insurance company sued for malpractice after its lawyer advised its policy excluded coverage.  *Com. Union*, 183 Ariz. at 253.

**¶31**        But the lawyer overlooked an Arizona Supreme Court opinion.  *Id.* The insured's bankruptcy trustee filed a coverage action.  *Id.* Coverage counsel advised the insurance company that the law firm overlooked the opinion, but he thought it was distinguishable.  *Id.*  The insurance company sought summary judgment, trying to distinguish the opinion.  *Id.*  That attempt failed, and the court in the coverage action denied summary judgment in December 1987.  *Id.* at 253–54.

**¶32**        Within two years, the insurance company and the law firm entered a tolling agreement.  *Id.* at 254.  In February 1990, the insurance company settled the coverage action.  *Id.*

**¶33**        The insurance company then sued the law firm.  At summary judgment, the law firm conceded "it was negligent in rendering [its] coverage opinion."  *Id.* at 252 n.1.  Despite more than two years passing since the law firm's opinion, we concluded the malpractice claim was timely.  *Id.* at 253.

¶34 We concluded the claim did not accrue when negligence occurred—accrual was delayed. Why? The discovery rule applies to each element of negligence: breach, causation, and damage. As we put it, "the discovery rule applies not only to the discovery of negligence, but also to discovery of causation and damage." *Id.* at 253. So accrual is delayed "until actionable negligence exists, that is, negligence" resulting "in appreciable, non-speculative harm to the client." *Id.* at 254. And negligence resulting "in no immediate harm or damage delays accrual[.]" *Id.*

¶35 Sometimes harm from transactional malpractice can be remedied or avoided through "a future appeal or other court proceedings." *Glaze*, 207 Ariz. at 30 ¶ 15 n.1. There, "the harm or damage resulting from . . . negligence [is] speculative and uncertain when the malpractice occur[s]," so accrual waits. *Com. Union*, 183 Ariz. at 255.

¶36 For example, in *Commercial Union*, accrual occurred in December 1987, when the court denied summary judgment in the coverage action based on the precedent the law firm missed. *Id.* at 258. It was only then that the insurance company knew its purpose for obtaining legal advice—to ensure it could deny coverage—was thwarted. Until then, it could not adequately know its lawyer's advice caused irremediable or irrevocable harm.

**2.**

¶37 Our supreme court recently came to a like conclusion in *Satamian*. *See* 257 Ariz. at 168 ¶ 1. In March 2015, the client hired an insurance agent to insure it against liability and defense costs. *Id.* ¶ 2. But the policy obtained did not list a "Yamaha watercraft" later "involved in a tragic accident." *Id.* ¶¶ 2–3. Because the policy omitted that watercraft, the insurance company denied coverage. *Id.* at 168 ¶ 4. Later, the client assigned its "insurance coverage claims" to the accident victim's father, and he pressed a negligent procurement claim. *Id.* at 169 ¶¶ 5–6.

¶38 Our supreme court concluded that claim accrued when the insurance company denied coverage, causing the client to incur defense costs. *Id.* at 172 ¶ 22. The court concluded the client "knew or should have known" that the agent caused the "wrong and the resulting injury" in May 2017 (two years after the negligence). *Id.* at 171 ¶ 16. It was then that the client "was required to fund its own defense." *Id.* at 172 ¶ 22.

¶39 The claim accrued then because in a "negligent procurement scenario, an insured anticipates full coverage, including defense and indemnification[.]" *Id.* at 171 ¶ 19. Put differently, that was then the client

knew the policy did not achieve one of its main objectives—to avoid defense costs. So when the client knew it was incurring defense costs, the negligent procurement claim accrued. *Id.* at 172 ¶ 23.

**3.**

**¶40**　　　　We apply a similar framework for malpractice claims based on negligent tax advice. Here, accrual occurs when the client sufficiently knows tax advice did not achieve its purpose.

**a.**

**¶41**　　　　In *CDT, Inc. v. Addison, Roberts & Ludwig, C.P.A., P.C.*, we considered when accrual occurred for an accounting malpractice claim. 198 Ariz. 173 (App. 2000). In December 1994, the California State Board of Equalization ("CSBE") audited CDT, Inc. ("CDT"). *Id.* at 174 ¶ 3. Afterward, a CSBE investigator informed CDT it had tax liability. *Id.* at 174–75 ¶ 3. In January 1996, the investigator said CDT owed over $3.2 million. *Id.* at 175 ¶ 3. In April 1996, CSBE adopted that recommendation. *Id.* CDT challenged that assessment in "administrative hearings." *Id.* ¶ 4.

**¶42**　　　　In September 1996, CDT sued an accounting firm for malpractice. Later, CDT added Addison, Roberts & Ludwig ("Addison"), another accounting firm. *Id.* Addison argued accrual began "immediately after the CSBE field investigator informed CDT of its sales tax liability in March 1995." *Id.* at 176 ¶ 8. In response, CDT relied on *Commercial Union* and argued accrual occurred later—in April 1996. *Id.* ¶¶ 8–9.

**¶43**　　　　We concluded CDT's claim was timely. *Id.* at 182 ¶ 32. We reasoned that malpractice, "transactional or otherwise, does not accrue until the plaintiff discovers the negligence and sustains ascertainable harm as a result of that negligence." *Id.* at 176 ¶ 10 (quoting *Com. Union*, 183 Ariz. at 256). "[T]hat principle," we explained, "applies to any negligence claim against professionals, including accountants." *Id.* So whether CDT would "be legally required to pay [a] tax liability [was] relevant to" accrual. *Id.* at 179 ¶ 21 (cleaned up). Only when the CSBE ordered CDT to pay back taxes could CDT know that one reason for obtaining tax advice—paying all taxes—was thwarted. Considering the CSBE's procedures, "any definitive assessment of tax liability against CDT could be made only after CSBE had made its determination and computation." *Id.* Even then, "any such assessment would abide CSBE's final decision after the redetermination process." *Id.* So CDT's claim was timely.

¶44  When explaining why *Commercial Union* saved CDT's claims, we observed that "[m]ost courts . . . have adopted the date of formal tax assessment as the accrual date in cases similar to this." *Id.* ¶ 22.

**b.**

¶45  Some have interpreted that statement in *CDT* as a bright-line rule in tax malpractice cases. *See Kennedy v. Goffstein*, 815 N.E.2d 646, 649 (Mass. App. 2004) (listing Arizona as a state that has "adopted a bright-line rule as to when the statute of limitations begins to run in cases concerning malpractice in the preparation of tax returns"). To be sure, a tax malpractice claim sometimes (maybe often) accrues when a taxing authority makes its final decision about taxes owed. But that is not always true. Sometimes such a claim accrues earlier; sometimes it accrues later. *CDT*'s "bright-line rule" is not so bright.

¶46  We are not the first to say so. This court clarified as much in *Coulter v. Grant Thornton, LLP*, 241 Ariz. 440, 445 ¶ 14 (App. 2017). There, the clients hired an accounting firm "to reduce their income tax liability[.]" *Id.* at 443 ¶ 2. The firm recommended an "ESOP/S structure." *Id.* The IRS rejected that structure, issuing a notice of deficiency for 2006 and 2007. *Id.* ¶ 3. Still, the accounting firm assured the clients they would win, so the clients "challenged the deficiency determinations and penalties in United States Tax Court." *Id.* But in 2011, the clients settled with the IRS, agreeing to pay back taxes. *Id.*

¶47  In November 2011, the clients sued for malpractice. *Id.* ¶ 5. The superior court dismissed that claim as untimely. *Id.* Applying *CDT*, the court concluded the claim "accrued when the IRS issued notices of deficiency in 2006 and 2007[.]" *Id.* at 444 ¶ 11.

¶48  We said *CDT* did not dictate. That was so because *CDT* did not involve a taxpayer continuing "to consult with [an] accountant" after the IRS issued a notice of deficiency and who relied "on the accountant's advice" while challenging "the IRS' determination in the tax court." *Id.* at 445 ¶ 12. We backed off a bright-line rule: "Although bright-line rules are often useful, there are compelling reasons to forego a rule under which a malpractice claim necessarily accrues immediately" after a taxing authority's final determination. *Id.* ¶ 14. So when "the taxpayer and the accountant reasonably continue to believe that the accounting advice was correct," accrual does not occur "when the IRS issues a notice of deficiency." *Id.* Accrual occurs later.

¶49 Accrual can also occur earlier—as when "an accountant or lawyer" acknowledges its "advice was improper, or if the taxpayer" obtains "a second opinion advising that the advice was improper[.]" *Id.* ¶ 15. Rejecting a bright-line rule while citing *Commercial Union*, we concluded that "[a] fact-based approach . . . is consistent with how we have addressed analogous claims involving attorney malpractice." *Id.* ¶ 16.

## II.

¶50 Distilling this caselaw, we proceed like this. We ask whether DMB's malpractice claim arises from litigation or transactional advice. If transactional, we pinpoint DMB's purposes for the legal advice. We then ask whether Mariscal's alleged malpractice thwarted those purposes when the transaction occurred or otherwise immediately caused DMB irrevocable or irremediable harm. If not, we determine when DMB knew or should have known Mariscal committed malpractice and caused irrevocable or irremediable harm. In making that determination, we do not apply a bright-line rule; we analyze the facts on their merits.

## A.

¶51 Mariscal did not commit litigation malpractice. Rather, Mariscal's alleged malpractice occurred when advising DMB how to convey an interest in real property and obtain a tax deduction—both transactional matters. In so doing, Mariscal drafted the Original Deed conveying a conservation easement. So Mariscal did not litigate for DMB. Recognizing that, Mariscal (correctly) does not invoke *Amfac* or its progeny.

## B.

¶52 Why did DMB engage Mariscal? For two main reasons. One, to convey a conservation easement. Two, to prepare a deed to "satisfy the requirements of Treasury Regulation Section 1.170A-14" and "qualify for a charitable contribution deduction" on its 2006 tax return. We analyze accrual with these two goals in mind.

## C.

¶53 Everyone now agrees Mariscal erred when drafting the Original Deed. But that is not dispositive. *See Com. Union*, 183 Ariz. at 252 n.1 (the law firm "conceded that it was negligent in rendering [its] coverage opinion"). Instead, accrual turns on (1) when DMB should have known Mariscal was negligent *and* (2) when DMB should have known Mariscal's negligence caused harm. *Com. Union*, 183 Ariz. at 253. To answer that

second question, we ask this: when should DMB have known Mariscal caused the "wrong and the resulting injury"? *Satamian*, 257 Ariz. at 171 ¶ 16. And recall that an injury starts the limitations clock once it is irremediable or irrevocable. *Glaze*, 207 Ariz. at 30 ¶ 15 n.1.

¶54　　DMB says the relevant harm is "the IRS's assessment of additional tax, interest, and penalties resulting from the improperly drafted [Original] Deed." So DMB argues accrual did not occur until December 2015, when the IRS issued an FPAA disallowing the Deduction. Mariscal responds that the relevant harm is "that the [Original] Deed was drafted improperly and did not comply with the relevant regulations[.]" Mariscal argues accrual occurred no later than 2012, when "DMB learned that the [Original] Deed contained errors[.]" Alternatively, Mariscal argues DMB was harmed when it began paying fees to defend against the IRS. Based on the facts here (not applying a bright-line rule), we conclude DMB should have known Mariscal caused it irremediable or irrevocable harm after the IRS issued an FPAA in December 2015.

### 1.

¶55　　The superior court concluded DMB suffered harm when executing the Original Deed—immediately. The court reasoned that "the alleged harm to DMB was that the [Original] Deed was drafted improperly and did not comply with the relevant regulations as DMB intended."

¶56　　We disagree DMB suffered immediate harm. It is undisputed that the Deed successfully conveyed a conservation easement. DMB did not suffer harm by executing the Original Deed because the easement was conveyed. After doing so, DMB claimed the Deduction on its tax return, which reduced its tax liability. Had the IRS never audited DMB's tax return, DMB would have suffered no harm (this case would not exist).

¶57　　So unlike the deed in *Keonjian* and the settlement agreement in *Kallof*, the Original Deed operated as intended at first. *See* 216 Ariz. at 566 ¶ 13; *see also* 142 Ariz. at 67–68. In 2006, it conveyed an easement and reduced DMB's tax liability—just as DMB wanted. Neither *Keonjian* nor *Kallof* support that DMB suffered immediate harm—let alone harm that was irremediable or irrevocable—when executing the Original Deed.

### 2.

¶58　　The superior court next concluded that "[t]he undisputed facts show that DMB was aware of the issues with the [Original] Deed and error by [Mariscal] at the latest in 2012 when it submitted its Protest to the

IRS and recorded the Amended and Restated Deed." Mariscal urges that same conclusion.

¶59 All agree DMB knew by 2012 that the Original Deed contained errors. DMB admitted that to the IRS and recorded the Amended Deed. But we disagree DMB knew in 2012 that Mariscal caused it irremediable or irrevocable harm.

¶60 Whatever mistakes Mariscal made did not impact whether DMB conveyed a conservation easement. The IRS never questioned whether DMB did so. Put differently, DMB conveyed a conservation easement in 2006 and it remained in 2012 (and today as far as we know).

¶61 As for the Deduction, DMB told the IRS in 2012 that Mariscal erred in drafting the Original Deed, so DMB recorded the Amended Deed. But DMB urged that the Original Deed allowed the Deduction. Here is what DMB told the IRS, "It is clear from [DMB's] [O]riginal Deed that [DMB] granted a vested property interest in perpetuity to [Buckeye] . . . and [Buckeye] understood that it was receiving the Conservation Easement in perpetuity." So DMB argued the Original Deed complied with the Code; the Amended Deed just "remove[d] any doubt."

¶62 Mariscal identifies no evidence that DMB objectively believed in 2012 that the Original Deed could not still achieve its tax goals. To be sure, DMB knew it faced a problem resulting from errors in the Original Deed. DMB knew it might have to pay more taxes because of those errors. But as *Commercial Union* explains, "[t]he threat of future harm from" malpractice does not "commence the limitations period." 183 Ariz. at 255. In 2012, DMB knew the IRS was challenging the Deduction. But DMB could not yet know whether any harm from the IRS doing so would materialize.

¶63 That separates this case from *Keonjian* and *Kallof*. In *Keonjian*, the plaintiff knew her lawyer's malpractice caused immediate harm. *See* 216 Ariz. at 566 ¶ 15. And in *Kallof*, the plaintiff pleaded that it suffered harm when executing the settlement agreement—the plaintiff immediately knew the source of its harm. *See* 142 Ariz. at 67–68. DMB defended the Original Deed even after acknowledging Mariscal erred. And Mariscal produced no evidence undercutting DMB's veracity in doing so.

¶64 Here is a hypothetical. Consider an attorney negligently drafts a deed in year one and the client takes a tax deduction. In year two, the client discovers the deed contains drafting errors, so it records an amended deed. In year six, IRS staff audits the client's tax return and contends the original deed violated the Code. So in year seven, the IRS

issues an FPAA disallowing the deduction. Under the superior court's view, the client suffered harm in year one. And under Mariscal's view, the client discovered that harm in year two. Why else record an amended deed? So accrual occurred in year two, requiring the client to sue for malpractice before year four, two years before the IRS ever audits its tax return and three years before the IRS disallows the deduction. But that conclusion would conflict with how we have handled accrual in this area. *See Com. Union*, 183 Ariz. at 256; *CDT*, 198 Ariz. at 179 ¶ 21.

**3.**

¶65        So DMB did not suffer harm in 2006 or have sufficient knowledge in 2012. When did accrual occur? DMB knew or should have known Mariscal caused DMB irremediable or irrevocable harm no earlier than the FPAA in December 2015.

**a.**

¶66        At the earliest, DMB suffered harm in 2010, when the IRS audited its 2006 tax return—not when DMB executed the Original Deed. It was not until 2010 that IRS staff notified DMB that the Deduction—one of two main reasons for Mariscal's representation—was at risk.

¶67        But DMB still could not know then whether its harm was irremediable or irrevocable or whether Mariscal caused its harm. Whether Mariscal did so hinged on the IRS proceedings, which might alleviate DMB's harm (i.e., allow it to keep the Deduction). *See Glaze*, 207 Ariz. at 30 ¶ 15 n.1.

¶68        And DMB used those proceedings to try to save the Deduction. Between 2011 and 2012, DMB challenged the Draft Lead Sheet, appealed the First 60-Day Letter, and supplemented its protest. As a result, the IRS returned the case to the Agent.

¶69        Then in 2014, the IRS acceded to some of DMB's positions. But the IRS still issued the 2014 Report, proposing to disallow the Deduction. In October 2014, the IRS issued the Second 60-Day Letter, again "proposing adjustments to partnership items for the partnership and [2006 tax year.]" DMB again appealed, "disput[ing] all of the[] proposed adjustments." For a year, DMB's tax counsel negotiated with the IRS. But in December 2015, the IRS issued an FPAA. The FPAA concluded that the Original Deed violated Section 170 by not "grant[ing] the conservation easement in perpetuity as evidenced by several separate sections." DMB

then sued and later settled with the United States, allowing DMB to deduct $6,610,000 for 2006.

¶70 The IRS did not take a final position until issuing an FPAA in December 2015. Until then, agency proceedings could have allowed DMB to avoid harm. *See Com. Union*, 183 Ariz. at 256–57 (accrual did not occur while "[t]he coverage issue was an open question"). Not until the IRS finalized its position should DMB have known that the Original Deed caused it harm. Before then, DMB's tax counsel argued—repeatedly and at length—that the Deduction complied with the Code. *See id.* at 257 ("Commercial Union's attorney believed that *Federal Insurance* could be successfully distinguished[.]"). If that position prevailed, the Deduction would have stood. *See id.* Until the FPAA, any risk to the Deduction could have proximately resulted from IRS staff pursuing an unmeritorious audit. *See id.* at 257–58. But like in *Commercial Union*, when the IRS issued an FPAA identifying Mariscal's errors and disallowing the Deduction, DMB "should have become aware" that Mariscal caused it harm. *Id.* at 256.

¶71 This comports with *CDT*. Just as the "procedures relating to tax audits and assessments [were] relevant" in *CDT*, the procedures for federal tax audits are relevant here. 198 Ariz. at 178–79 ¶ 20. Under federal law, the FPAA was the IRS's final position on whether the Deduction complied with the Code. *See Kaplan v. United States*, 133 F.3d 469, 471 (7th Cir. 1998) (explaining that "notice to each partner of any adjustments to partnership items . . . takes the form of a final partnership administrative adjustment (FPAA)" detailing "the IRS's approval or rejection of the partnership's claims of taxable income and deductions."). Until an FPAA, the IRS's staff might have changed its position. And here, that happened. Based on DMB's advocacy, the IRS returned the case to the Agent, acceded to some of DMB's positions, issued a Second 60-Day Letter, and agreed to part of the Deduction. As in *CDT*, whether DMB would "be legally required to pay the tax liability is relevant" for accrual. *See id.* at 179 ¶ 21 (cleaned up). "At the earliest, any definitive assessment of tax liability against [DMB] could be made only after [the IRS] made its determination and computation." *See id.* So at the earliest, DMB's claim accrued with an FPAA in December 2015.

¶72 We need not decide whether DMB's claim accrued later— DMB's claim is timely if it accrued in December 2015. *See Coulter*, 241 Ariz. at 445 ¶ 14. And no circumstances trigger accrual earlier. *See id.* ¶ 15. Mariscal did not admit "the challenged advice was improper," DMB did not "obtain[] a second opinion advising that the advice was improper," and

DMB protested the IRS's position until settling with the United States.  *See id.*

¶73        The superior court distinguished *CDT* because it involved accounting malpractice and this case involves legal malpractice.  That is a distinction without a difference.  Although one could read *CDT* as creating a bright-line rule for tax malpractice claims, *Coulter* clarified we instead apply "[a] fact-based approach."  *Id.* ¶ 16.  That approach, we explained, "is consistent with how we have addressed analogous claims involving attorney malpractice."  *Id.*  But applying a fact-based approach to accounting and legal malpractice claims alike does not make *CDT* irrelevant.  The malpractice claim in *CDT* is like DMB's claim, so how *CDT* applied the discovery rule (based on *Commercial Union*) is relevant.  *See* 198 Ariz. at 176 ¶ 10 ("[W]e find [*Commercial Union*] instructive and supportive of CDT's position.").  Applying a fact-based approach—not a bright-line rule—DMB's malpractice claim accrued no earlier than December 2015.

**b.**

¶74        In 2010, DMB hired tax counsel to defend against the audit.  Mariscal argues tax counsel's fees triggered accrual.  We disagree.

**i.**

¶75        *Commercial Union* rejected that incurring attorney fees automatically triggers accrual.  There, the defendant law firm argued the plaintiff's claim accrued in 1987, when the law firm's "negligence *caused* Commercial Union . . . damages," including "defense costs[.]"  *Com. Union*, 183 Ariz. at 257.  We concluded that argument rested on this false premise: the client "should have known [its] defense costs" proximately resulted from the law firm's negligence.  *Id.*  Instead, the client could not know the law firm caused its harm until the superior court rejected its coverage position.  Put differently, "[i]f the client had won the lawsuit, he would not" be able "to claim that negligent advice" caused "his defense expenses."  *Id.*  We concluded the client, for a time, could not pinpoint who caused its defense costs.  *Id.*  Rather, "[s]uch costs may have" proximately resulted from the law firm's "negligence, or they may have" resulted from "the trustee's filing of a non-meritorious lawsuit."  *Id.* at 257–58.  The client's claim accrued when it "should have known who and what caused the expenditure of attorney's fees in the coverage suit."  *Id.* at 258.

¶76        Similarly in *CDT*, we rejected that the client's "expenditure of attorneys' fees" investigating "its potential liability after [an audit] necessarily constitutes legally cognizable damages" for accrual.  198 Ariz.

at 181 ¶ 29. Instead, expending attorney fees did not necessarily start the limitations clock. *Id.* We cited *Commercial Union* to conclude the client's "defense costs" did not start accrual, when such costs could have stemmed from the "law firm's negligence or" because a third party filed an action without justification. *Id.*

**ii.**

¶77        Yes, DMB incurred attorney fees amending the Original Deed and dealing with the IRS. But under *Commercial Union* and *CDT*, that did not necessarily trigger accrual.

¶78        Instead, accrual occurred only when the IRS issued an FPAA in December 2015. Until then, DMB could not know Mariscal's error proximately caused it harm. Until then, DMB's attorney fees may have resulted from the law firm's "negligence, or they may have" resulted from the IRS taking unsupported positions. *See Com. Union*, 183 Ariz. at 257–58; *see also CDT*, 198 Ariz. at 181 ¶ 29. And until the FPAA, DMB could not claim Mariscal's negligent advice caused its defense costs. *Id.* DMB's claim accrued when it "knew or should have known who and what caused" its attorney fees. *Com. Union*, 183 Ariz. at 258. Once the IRS took its final position, DMB should have known Mariscal's error did so. Only then did accrual occur. *See id.* at 257–58; *CDT*, 198 Ariz. at 181 ¶ 29.

¶79        *Satamian* does not help Mariscal. There, the limitations period started when the client incurred fees because the plaintiff brought a negligent procurement claim. *Satamian*, 257 Ariz. at 171 ¶ 19. Such a claim alleges the insured "anticipate[d] full coverage, including defense and indemnification of a claim within the scope of coverage." *Id.* So such a claim accrues when "coverage is deficient" because "uncovered claims . . . caus[e] actual harm by requiring the insured to incur costs to defend against the uncovered claim." *Id.*

¶80        Mariscal did not indemnify DMB should the IRS challenge the Deduction. So unlike in *Satamian*, the limitations period did not automatically trigger when DMB incurred attorney fees. *See id.* at 171 ¶ 19. Instead, the limitations period began when DMB could know Mariscal caused it to lose the Deduction. DMB could not know Mariscal did so until the IRS issued an FPAA—the IRS's official position. At that point, DMB should have known Mariscal caused its harm, including by incurring fees.

## CONCLUSION

**¶81**  DMB's claim accrued no earlier than December 2015. Through a tolling agreement, DMB and Mariscal paused the limitations period from July 2016 to June 2018. DMB sued Mariscal in August 2018. Considering the tolling agreement, DMB sued Mariscal less than two years after accrual. So we vacate summary judgment and remand for proceedings consistent with this opinion. And with that, Mariscal's cross-appeal is moot.



**MATTHEW J. MARTIN • Clerk of the Court**
**FILED**:  JR